IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Crim. No. 4:21-cr-253-ALM-KPJ-23 |
| | § | |
| EJIRO OHWOVORIOLE (23), | § | |
| | § | |
| Defendant. | § | |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant Ejiro Ohwovoriole's ("Defendant") Motion to Suppress (the "Motion to Suppress") (Dkt. 840), to which the Government filed a response (the "Response") (Dkt. 893) and supplemental briefing (the "Supplemental Briefing") (Dkt. 1031), and Defendant filed a reply (the "Reply") (Dkt. 930). On October 6, 2023, the District Judge referred the Motion to Suppress (Dkt. 840) to the undersigned. *See* Dkt. 847. For the reasons that follow, the Court recommends that the Motion to Suppress (Dkt. 840) be **DENIED**.

I.     BACKGROUND

On September 9, 2021, the United States Grand Jury indicted Defendant alongside twenty-seven other individuals (together with Defendant, "Defendants") for Conspiracy to Commit Wire Fraud and Conspiracy to Commit Money Laundering in violation of 18 U.S.C. §§ 1343, 1349, 1956(h). *See* Dkt. 4 at 2, 12, 17. On September 21, 2023, United States Magistrate Judge Christine A. Nowak signed a search warrant (the "Warrant") permitting the search of several residences, including Defendant's home (the "Home"). *See* Dkt. 893-1 at 2, 14, 25. The Warrant was supported by the affidavit (the "Affidavit") of Special Agent Rodney A. Sanchez ("Agent Sanchez") of the Federal Bureau of Investigation (the "FBI"). *Id.* at 4–24. The Affidavit

1

also appended a copy of the indictment (the "Indictment") (Dkt. 4), which it incorporated by reference. *See id.* at 7 ("The Indictment is attached hereto . . . and the facts and information contained therein are incorporated by reference.").

### A.   Indictment

The Indictment (Dkt. 4) alleges that Defendants "used a multitude of fraudulent schemes to unlawfully obtain money from their victims, including online romance scams, business email compromise and investor fraud, and unemployment insurance fraud." Dkt. 4 at 3. Defendants further "coordinated" their schemes to "disguise, disburse, and launder" the fraudulently obtained currency. *Id.* In addition, Defendants conducted and coordinated most of their fraudulent activities over the internet via email and cellular applications, like "WhatsApp." *See id.* at 3–4. As to Defendant specifically, the Indictment (Dkt. 4) alleges that he "met with others in the Eastern District of Texas to discuss the logistics of business email compromise schemes, percentage cuts, and account transfers." *Id.* at 6.

### B.   Affidavit

In the Affidavit, Agent Sanchez, a fifteen-year veteran of the FBI, states that he specializes in the investigation of "criminal violations relating to multiple types of fraud, money laundering[,] and illegal drug trafficking." Dkt. 893-1 at 4. Agent Sanchez further states that he has obtained "specialized training in the investigation and enforcement of transnational organized criminal activities in which computers and electronic communications are utilized to facilitate organized crime." *Id.* Based on this training and experience, Agent Sanchez concludes that "evidence, instrumentalities, contraband, and/or fruits" of the crimes charged would be found in the Home. *Id.* at 6, 25. Specifically, Agent Sanchez states that based on his "training and experience," many "critical documents" including "passports and bank cards are kept either on an individual's person,

in their residence, or in their vehicle." *Id.* at 15. In addition, "debit cards . . . are usually kept in an individual's wallet, which would be stored likely in the residence . . . [or] in a vehicle." *Id.* Agent Sanchez further states that individuals "often" store currency "in their residence." *Id.* at 16. Similarly, Agent Sanchez states that, based on his "investigation in this case[ and] training and experience from prior investigations . . . [,] individuals engaged in these types of crimes spend a great deal of time, effort, and money in an attempt to procure or create fraudulent identity documents and devices in an attempt to derive benefits, trust, or authority" from their victims. *Id.*

Agent Sanchez further states that those he has "previously investigated routinely kept detailed ledgers of their fraudulent transactions." *Id.* Consistent with his experience, Agent Sanchez claims that Defendants in this case have used similar ledgers. *See id.* Furthermore, those "involved in these types of schemes . . . commonly maintain documents to support these ledgers with genuine bank records, bank generated financial transaction receipts, and notes on when and where said individuals opened bank accounts using which fraudulent identity." *Id.* According to Agent Sanchez, these ledgers—and supporting documents—are "retained indefinitely at an individual's home and[,] based on the facts of this case, retained for safe keeping in order to commit future financial and identity crimes." *Id.* Based on this information, as well as the information contained in the appended Indictment (Dkt. 4), the Warrant authorized the search and seizure of an exhaustive list of records from the Home, both digital and physical.[1]

---

[1] Specifically, this list includes the following: (1) "computers, storage media, and network equipment, and cellular phone(s)"; (2) "Internet connected data storage or processing services"; (3) "Computer related documentation"; (4) "Computer software"; (5) "Data security devices"; (6) "Routers and access points"; (7) "Records evidencing occupancy or ownership of the [Home]"; (8) "Any and all notes, documents, records, computer files[,] or correspondence"; (9) "Tax return preparation records"; (10) "Electronic or paper documents related to bank records, invoices, business correspondence . . . , and other business records"; (11) "U.S. currency, electronics, valuables[,] and safes designed to store" the same; (12) "Devices, documents, or information related to payments, finances, and digital or electronic currency"; (13) "Digital recorders and associated storage mediums"; (14) "Records, documents, correspondence, faxes, and e-mails sent to and received from any State Workforce Agency"; (15) "Records and documents containing . . . Personally Identifiable Information"; (16) "Debit cards[,] checks[,] and Electronic Bill

**C.  Motion to Suppress**

On October 5, 2023, Defendant filed the Motion to Suppress (Dkt. 840), wherein he asserts three main arguments. First, Defendant contends that the Warrant is based on stale information. *See* Dkt. 840 at 3. According to Defendant, the Indictment (Dkt. 4), which was appended to the Affidavit and incorporated by reference, discusses a meeting between Defendant and "others" on April 23, 2019. *Id.* at 2–3. As the Warrant issued on September 21, 2021, more than two years after the alleged meeting and after Defendant had moved residences, Defendant concludes that the Warrant is based on stale information. *See id.* Second, Defendant argues that "the Affidavit is bare bones[] and fails to provide evidence of a nexus between an alleged crime and the place to be searched." *Id.* at 9. While Defendant acknowledges that Agent Sanchez connects evidence of the alleged crime to the Home by referencing conclusions drawn from his "training and experience," Defendant contends that such "generalizations" are insufficient to establish a nexus. *Id.* Defendant therefore concludes that the "good faith exception to the exclusionary rule does not apply" and the evidence derived from the search of the Home must be suppressed. *See id.* at 9–10. Third, Defendant contends that "the Affidavit does not establish sufficient probable cause to search [the Home because it is] based on an in-person meeting that occurred two years and five months prior to the search, and at a time when [Defendant] was not even living at the residence that was actually searched." *Id.* at 10.

On October 16, 2023, the Government filed the Response (Dkt. 893), wherein it argues that the meeting between Defendant and others was not based stale information because Defendant was "charged with an ongoing conspiracy dating from January 2017 to . . . September 9, 2021."

---

Payment received from any State Workforce Agency"; (17) "Copies of and actual drivers licenses, state identification cards, passports, and other forms of identification"; (18) "Bank records or records received from financial institutions"; (19) "Cash or cash equivalents"; and (20) "Records relating to the acquisition, secreting, transfer, concealment, and/or expenditure of money." Dkt. 893-1 at 26–32.

Dkt. 893 at 8. In addition, the Government argues that "[t]he evidence sought . . . was likely to be kept for a long period of time as necessary to the ongoing crime"; that is, "recordkeeping of how funds were distributed was an essential element of the ongoing scheme[,] and it was reasonable to believe that records would be retained for long periods of time and would follow a conspirator from one residence to another." *Id.*

The Government further argues that the good faith exception to the exclusionary rule applies in the present case. Although the Government recognizes that an "affidavit must establish a nexus between the house to be searched and the evidence sought," it contends that such a nexus "may be established through direct observation or through 'normal inferences as to where the articles sought would be located.'" *Id.* at 6. According to the Government, Agent Sanchez routinely relied on generalizations based on his training and experience as well as "normal inferences" to establish the nexus. *Id.* For example, when a defendant is charged "with conducting online scams and then laundering the proceeds of the scams," it is "a normal inference to believe that participants . . . would use personal computers and related equipment located (or at least stored) in their home." *Id.* It is "also a normal inference that records related to [the] laundering of proceeds would be stored in a defendant's home." *Id.* at 7. Thus, the Government concludes that the Affidavit provides a sufficient nexus and, thus, the good faith exception to the exclusionary rule applies. *See id.* at 2, 5–7.

On October 20, 2023, Defendant filed the Reply (Dkt. 930), wherein he emphasizes that the Indictment (Dkt. 4), while appended to the Affidavit and incorporated by reference, only mentions that Defendant "met with others in the Eastern District of Texas to *discuss* the logistics of business email compromise schemes, percentage cuts, and account transfers." Dkt. 930 at 2 (emphasis in original). Defendant contends that "[t]here are no facts that allege [Defendant]

5

actually *did* discuss anything." *Id.* (emphasis in original). According to Defendant, the Affidavit contains nothing more than generalizations and the conclusory statement that Defendant attended a meeting with unidentified "others." *See id.*[2] Thus, Defendant concludes that the Affidavit is bare bones. *See id.* at 2–4.

**D.    Evidentiary Hearing**

On November 28, 2023, the Court held a hearing (the "Hearing") on the Motion to Suppress (Dkt. 840). At the Hearing, the United States was represented by Assistant United States Attorney Lesley Brooks ("Ms. Brooks"). Defendant was represented by Mr. Cody Lee Skipper ("Mr. Skipper"). Agent Sanchez primarily testified regarding his training and experience. Specifically, Agent Sanchez testified that he has been employed with the FBI since November 2006, where he served in several roles specializing in "internet-based crimes." In 2018, Agent Sanchez moved to the Transnational Organized Crime squad for the Eastern Hemisphere (the "TOC East Group"), where he began assisting in the investigation of "Black Axe"—a Nigerian organized crime syndicate. That investigation eventually led to Defendant.

**E.    Supplemental Briefing**

On December 8, 2023, the Government filed the Supplemental Briefing (Dkt. 1031), wherein it re-urges many of the arguments made in the Response (Dkt. 893). *See, e.g.*, Dkt. 1031 at 11 (arguing "'normal inferences' may establish the nexus between the crime and the location to be searched"); *id.* at 14 (contending the Affidavit is not based on stale information because Defendant is "charged with an ongoing conspiracy"). However, the Government also argues that, because a nexus may be established by "normal inferences," a nexus also exists when the items to

---

[2] The Indictment (Dkt. 4) expressly identifies two of the meeting's attendees by name: Defendant and Co-Defendant Osaretin Eghaghe. Dkt. 4 at 6.

be searched or seized are "precisely the sorts of items which people tend to keep at home." *Id.* at 2, 10–11 (emphasis omitted).

## II. LEGAL STANDARD

### A. Fourth Amendment

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Thus, under the Fourth Amendment, every warrant must be supported by probable cause. The determination of probable cause calls for a "practical, common-sense decision [of] whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *See Illinois v. Gates*, 462 U.S. 213, 214 (1983).

### B. Exclusionary Rule

"The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands . . . ." *United States v. Leon*, 468 U.S. 897, 906 (1984). Nevertheless, the exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Therefore, when evidence is improperly obtained in violation of the Fourth Amendment, that evidence, as well as the fruits derived therefrom, may be excluded from use at trial. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion, as is evidence later discovered and found to be derivative of any illegality or fruit of the poisonous tree." (cleaned up)).

### C. Good Faith Exception

The exclusionary rule does not command the exclusion of all impermissibly obtained evidence. Instead, exclusion must serve to "deter police misconduct." *See Leon*, 468 U.S. at 916. When evidence is obtained pursuant to a search warrant, exclusion rarely serves this goal. *See id.* at 913–14; *see also Stone v. Powell*, 428 U.S. 465, 498 (1976) (Burger, C.J., concurring) ("Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Imposing an admittedly indirect 'sanction' on the police officer in that instance is nothing less than sophisticated nonsense."). Thus, "[e]vidence should not be suppressed when law enforcement obtained it in good-faith reliance on a warrant." *United States v. Morton*, 46 F.4th 331, 335 (5th Cir. 2022) (citing *Leon*, 468 U.S. at 897).

### D. Bare Bones Affidavit

"Reliance on a warrant is unreasonable," and thus not in good faith, when "the warrant is based on an affidavit so lacking in probable cause as to render belief in its existence unreasonable." *Id.* at 336 (first citing *Leon*, 468 U.S. at 923; and then citing *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012)). Such "'[b]are bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Id.* (quoting *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992)) (internal quotation marks omitted). Nevertheless, "[t]he affidavit must tend to show some nexus between the house to be searched and the evidence sought." *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir. 1994) (citing *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982)). This nexus "may be established either through direct observation or through normal inferences as to where the articles sought would be located." *Id.* (quoting *Freeman*, 685 F.2d at 949) (internal quotation marks omitted). The critical question is "whether a reasonably well trained officer would have

8

known that the search was illegal despite the magistrate's authorization." *United States v. Brown*, 567 F. App'x 272, 281 (5th Cir. 2014) (quoting *Leon*, 468 U.S. at 922 n.23).

### III. ANALYSIS

#### A. Staleness

In the Motion to Suppress (Dkt. 840), Defendant argues that the Affidavit is based on stale information and, therefore, lacks probable cause. *See* Dkt. 840 at 3. In the Response (Dkt. 893) and Supplemental Briefing (Dkt. 1031), the Government argues that the information is not stale because the Indictment (Dkt. 4) alleges that Defendant engaged a years-long conspiracy, the records of which were "likely to be kept for a long period of time." Dkts. 893 at 8; 1031 at 14. The Court agrees with the Government.

"Stale information in an affidavit cannot support probable cause." *United States v. Gallegos*, 239 F. App'x 890, 896 (5th Cir. 2007). Instead, "[t]he proof must be of facts closely related in time to the issuance of the warrant in order to justify a finding of probable cause at that time." *Id.* (quoting *United States v. McKeever*, 5 F.3d 863, 866 (5th Cir. 1993)) (internal quotation marks omitted). Whether a delay renders information stale "depends on the facts of the case, including the nature of the criminal activity and the type of information." *United States v. Ruelas*, 761 F. App'x 366, 370 (5th Cir. 2019) (citing *United States v. Allen*, 625 F.3d 830, 842 (5th Cir. 2010)).

To determine whether information is stale, courts consider: "(1) whether there existed a longstanding pattern of criminal activity, and (2) whether the evidence in question 'is of the sort that can reasonably be expected to be kept for long periods of time in the place to be searched.'" *Id.* (quoting *United States v. Craig*, 861 F.2d 818, 822–23 (5th Cir. 1988)); *see United States v. Hester*, No. 18-cr-85, 2020 WL 620911, at *2 (E.D. Tex. Feb. 10, 2020) (quoting *United States v.*

*Rojas Alvarez*, 451 F.3d 320, 332 (5th Cir. 2006)). Even if the warrant fails to "identify any ongoing criminal activity," the Fifth Circuit has routinely held that one- to two-year-old information is not necessarily stale. *See, e.g.*, *United States v. Robinson*, 741 F.3d 588, 597 (5th Cir. 2014) (collecting cases).

In the present case, the Affidavit and appended Indictment (Dkt. 4) implicate Defendant in an "ongoing pattern of criminal activity." *United States v. Alvarez*, 561 F. App'x 375, 388 (5th Cir. 2014) (quoting *Craig*, 861 F.2d at 822). Thus, the information is not stale. *See id.* Defendant concludes otherwise because he impermissibly focuses on the allegation that, on April 23, 2019, he "met with others in the Eastern District of Texas to discuss the logistics of business email compromise schemes, percentage cuts, and account transfers." Dkt. 4 at 6; *see* Dkt. 840 at 3–4. But the thrust of the Affidavit and, thereby, the Indictment (Dkt. 4) is that Defendant, along with a host of co-conspirators, engaged in a years-long conspiracy to defraud victims. *See, e.g.*, Dkt. 893-1 at 6–7 (alleging that the conspiracy continued from 2017 to 2021—when Defendants were indicted); *id.* at 8 ("[D]efendants used a multitude of fraudulent schemes to unlawfully obtain money from their victims, including online romance scams, business email compromise and investor schemes, and unemployment insurance fraud."). Thus, the first consideration militates against a finding of staleness.

In addition, based on Agent Sanchez's training and experience, those engaged in money laundering and other internet-based crimes permanently store records of their crimes, both physical and digital, in their homes. *See* Dkt. 893-1 at 15–17. "Because records can 'reasonably be expected to be kept for long periods of time in the place to be searched,' the second consideration also precludes determining that the evidence was stale." *United States v. Bonds*, 497 F. App'x 426, 429–30 (5th Cir. 2012) (quoting *Craig*, 861 F.2d at 823). Therefore, the information contained in

10

the Affidavit, including the allegation that Defendant met with others on April 23, 2019, to discuss the conspiracy, was not stale. Furthermore, as will be discussed in greater detail below, even if the information was stale—precluding its contribution to probable cause—"officers may still be able to execute [the] warrant in good faith." *E.g.*, *Hester*, 2020 WL 620911, at *2.

**B.    Nexus**

In the Motion to Suppress (Dkt. 840), Defendant argues that the Affidavit is bare bones and, therefore, the good faith exception to the exclusionary rule is inapplicable. Dkt. 840 at 9. Specifically, Defendant contends that the Affidavit "fails to provide evidence of a nexus between an alleged crime and the place to be searched." *Id.* According to Defendant, the Affidavit contains only "generalizations" based on Agent Sanchez's "training and experience." *See id.* Defendant concludes that such "generalizations" are insufficient to establish the nexus, rendering the "good faith exception to the exclusionary rule" inapplicable. *Id.* In the Response (Dkt. 893), the Government argues that there is a sufficient nexus between the evidence sought and place to be searched based on "normal inferences" as to where such evidence would be stored, as well as generalizations founded on Agent Sanchez's training and experience. Dkt. 893 at 6. The Court agrees with the Government.

The good faith exception to the exclusionary rule is inapplicable when "the warrant is based on an affidavit so lacking in probable cause as to render belief in its existence unreasonable." *Morton*, 46 F.4th at 336 (first citing *Leon*, 468 U.S. at 923; and then citing *Triplett*, 684 F.3d at 504). Ultimately, the question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Brown*, 567 F. App'x at 281 (quoting *Leon*, 468 U.S. at 922 n.23). At the minimum, however, "[t]he affidavit must tend to show

11

some nexus between the house to be searched and the evidence sought." *Garcia*, 27 F.3d at 1014 (citing *Freeman*, 685 F.2d at 949).

1. **Normal Inferences**

The nexus between the things to be seized and the place to be searched "may be established either through direct observation or through normal inferences as to where the articles sought would be located." *Id.* (quoting *Freeman*, 685 F.2d at 949) (internal quotation marks omitted). "For instance, evidence that a defendant has stolen material which one would normally expect him to hide at his residence will support a search of his residence." *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977) (internal quotation marks omitted) (collecting cases). Thus, a nexus may be established when the things to be seized are "precisely the sorts of items which people tend to keep at home among their personal papers and effects." *See Freeman*, 685 F.2d at 949.

In the present case, many of the records to be seized are "precisely the sorts of items which people tend to keep at home," such as bank records and personal identification documents. *See id.* ("Passports, personal identification, and bank records are precisely the sorts of items which people tend to keep at home among their personal papers and effects."). Furthermore, the Affidavit states that Defendant participated in an international, long-term, internet-based conspiracy to defraud victims and launder the proceeds. *See* Dkt. 893-1 at 6–8. Under these facts, as alleged in the Affidavit and appended Indictment (Dkt. 4), it is reasonable to infer that digital and physical records of the alleged crimes would be found in the Home.[3] Furthermore, as discussed below, these inferences are drawn in combination with, and supported by, Agent Sanchez's generalizations.

---

[3] The mere "fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime." *Freeman*, 685 F.2d at 949. Therefore, just because Defendant was indicted does not—in and of itself—furnish probable cause to search the Home. The Court draws its inferences from the "type of crime involved" as well as the nature of its execution. *See United States v. Gildon*, No. 08-cr-141, 2008 WL 11438217, at *3 (W.D. Tex. Nov. 19, 2008) (first citing *Maestas*, 546 F.2d at 1180; and then citing *United States v. Whitner*, 219 F.3d 289, 297–98 (3d Cir. 2000)).

12

### 2.     Generalizations

"Generalizations in an affidavit regarding the likely location of evidence will not undermine the reasonableness of reliance on the warrant." *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003) (citing *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996)). Although such generalizations "alone might be insufficient to render official reliance reasonable, other facts in the affidavit taken together with generalizations founded upon training and experience could support reasonable reliance." *Id.* (citing *Broussard*, 80 F.3d at 1034–35; *see United States v. Pickens*, No. 12-cr-356, 2013 WL 1155414, at *8 (N.D. Tex. Mar. 21, 2013).

In the present case, the "normal inferences" are bolstered by Agent Sanchez's training and experience. In the Affidavit, Agent Sanchez, a fifteen-year veteran of the FBI, represents that he has "specialized training in the investigation and enforcement of transnational organized criminal activities in which computers and electronic communications are utilized to facilitate organized crime." Dkt. 893-1 at 4. Based on this training and experience, Agent Sanchez concludes that many "critical documents," such as bank records and personal identification documents, are stored "on an individual's person, in their residence, or in their vehicle." *Id.* at 15. Agent Sanchez further contends that those involved in similar financial crimes "routinely [keep] detailed ledgers of their fraudulent transactions." *Id.* Consistent with this contention, Agent Sanchez claims that others involved in this conspiracy used similar ledgers. *See id.* Such ledgers are often supported by bank records, both genuine and fraudulent. *See id.* According to Agent Sanchez, these ledgers and supporting documents are "retained indefinitely at an individual's home." *Id.* These generalizations might be insufficient—by themselves—to furnish a nexus between the records sought and the Home. However, when combined with the "normal inferences" discussed above, the Court cannot conclude that "the warrant is based on an affidavit so lacking in probable cause

13

as to render belief in its existence unreasonable." *Morton*, 46 F.4th at 336 (first citing *Leon*, 468 U.S. at 923; and then citing *Triplett*, 684 F.3d at 504).

Defendant relies on *United States v. Guerra*, No. 18-144, 2021 WL 391725 (S.D. Tex. Feb. 2, 2021), for the proposition that the Affidavit fails to "establish a nexus between the house to be searched and the evidence sought." *See* Dkt. 840 at 8. This case is wholly inapposite. In *Guerra*, the affidavit provided no link between the evidence sought and the home to be searched—neither generalizations nor normal inferences. The basis for the search of the defendant's home was "that the [defendant] attended a Texas Chicano Brotherhood meeting on November 18, 2018[,] and the [defendant] was in the possession of an AK-47 and a handgun." *See Guerra*, 2021 WL 391725, at *2. These facts fail to link the evidence sought with the place to be searched. The Affidavit in the present case is distinguishable because it includes both generalizations and normal inferences.

Moreover, the Affidavit is unlike the threadbare examples previously identified as "bare bones" by the Supreme Court and the Fifth Circuit. In *Nathanson v. United States*, 290 U.S. 41 (1933), the affidavit "said nothing more than that the agent 'has cause to suspect and does believe that certain merchandise . . . has otherwise been brought into the United States contrary to law, and that said merchandise is now deposited and contained within' the defendant's home." *Morton*, 46 F.4th at 337 (omission in original) (quoting *Nathanson*, 290 U.S. at 44). In *Aguilar v. Texas*, 378 U.S. 108 (1964), the affidavit stated that police officers "received reliable information from a credible person and do believe that [drugs] are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." *Morton*, 46 F.4th at 337 (alteration in original) (quoting *Aguilar*, 378 U.S. at 109) (internal quotation marks omitted). In *United States v. Barrington*, 806 F.2d 529 (5th Cir. 1986), the affidavit stated "nothing more than that the officer

'received information from a confidential informant' who was known to him and who had 'provided information in the past that ha[d] led to arrest and convictions.'" *Morton*, 46 F.4th at 337 (alteration in original) (quoting *Barrington*, 806 F.2d at 531). Bare bones affidavits, like these, "contain wholly conclusory statements" and lack "facts and circumstances" for the independent determination of probable cause. *Id.* at 336 (quoting *Satterwhite*, 980 F.2d at 321). That is not the case here. For this reason, as well as those discussed above, the Motion to Suppress (Dkt. 840) should be denied.

**C.     Probable Cause**

When considering the validity of a search warrant, courts usually "determine whether the good-faith exception to the exclusionary rule . . . applies" and then decide whether the warrant is supported by probable cause. *See, e.g.*, *Payne*, 341 F.3d at 399. However, if the good faith exception applies, there is no need to "reach the question of probable cause for the warrant unless it presents a 'novel question of law,' [the] resolution of which is 'necessary to guide future action by law enforcement officers and magistrates.'" *Id.* (quoting *Leon*, 468 U.S. at 925). The present case presents no such "novel question of law." Thus, as the Court concludes that the good faith exception is applicable here, it declines to consider probable cause.

### IV.     RECOMMENDATION

For the foregoing reasons, the Court recommends the Motion to Suppress (Dkts. 840) be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party filing objections is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *see also Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten (10) to fourteen (14) days).

**So ORDERED and SIGNED this 5th day of January, 2024.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE